UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
ESTATE OF MICHAEL HEISER, et al.,

                      Petitioners,

        -against-

BANK OF TOKYO MISTUBISHI UFJ, NEW
YORK BRANCH,

                    Respondent.
------------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1-29-13
```

11 Civ. 1601 (PKC)

MEMORANDUM AND ORDER

        The petitioners are family members and the estates of seventeen U.S. Air Force servicemembers killed in the 1996 terrorist attacks on the Khobar Towers in Saudi Arabia. They seek to enforce a judgment against the Islamic Republic of Iran, the Iranian Ministry of Information and Security, and the Iranian Islamic Revolution Guard Corps, all of which were found by the United States District Court for the District of Columbia (Hon. Royce C. Lamberth, U.S.D.J.) (the "District of Columbia Court") to have provided support for the terrorist attacks.

        Petitioners move for summary judgment and seek an order compelling respondent Bank of Tokyo Mitsubishi UFJ, New York Branch ("Bank of Tokyo") to turn over funds that they claim belong to Iran-based entities that function as mere instrumentalities of the Islamic Republic of Iran. The funds were initially electronic funds transfers ("EFTs") that were blocked pursuant to directives of the United States Department of Treasury, and now sit in interest-bearing accounts held by the Bank of Tokyo. The Bank of Tokyo does not oppose the motion.

The petitioners have come forward with evidence that the funds they seek to attach belong to instrumentalities of the Islamic Republic of Iran, and were lawfully blocked pursuant to presidential orders and Department of Treasury authority. For reasons that will be explained, such assets may be attached in satisfaction of a judgment. The petitioners' motion is therefore granted.

BACKGROUND

For the purpose of this motion, the following facts are undisputed, and the record is scrutinized in the light most favorable to the respondent. See, e.g., Costello v. City of Burlington, 632 F.3d 41, 45 (2d Cir. 2011).

The respondent does not dispute the facts set forth by the petitioners, and has submitted no counter-statement in opposition to the petitioners' statement of undisputed facts filed pursuant to Local Rule 56.1. In its memorandum of law, the respondent states that it "does not oppose the ultimate relief sought by Petitioners in the Motion, namely, the turnover of the Blocked Assets." (Response Mem. at 1.) It also describes itself as a "disinterested stakeholder" in the underlying assets. (Response Mem. at 3.)

A.  Proceedings in the District of Columbia Court.

On June 25, 1996, an attack on the Khobar Towers complex in Saudi Arabia killed nineteen U.S. Air Force personnel. (Pet. 56.1 ¶ 1.) The petitioners in this case include representatives of the estates for seventeen of those victims. (Pet. 56.1 ¶¶ 2-4.)

Petitioners were plaintiffs in two actions filed in the District of Columbia Court. On September 29, 2000, certain of the petitioners filed an action pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1330, et seq. (the "FSIA"). See Heiser v. Iran, 00 Civ. 2329 (D.D.C.) (RCL). (Pet. 56.1 ¶ 3.) The FSIA establishes exclusive federal

jurisdiction over actions against foreign states, 28 U.S.C. § 1330, and includes a terrorism

exemption for a foreign state's immunity, 28 U.S.C. § 1605A.  Petitioners asserted that the

Islamic Republic of Iran, the Iranian Ministry of Information & Security (the "MOIS") and

the Iranian Revolutionary Guard Corps (the "IRGC") were liable to them for wrongful death

and intentional infliction of emotional distress.  (Pet. 56.1 ¶ 3.)  Additional petitioners in this

action brought similar claims against the same defendants in a second action filed on October

9, 2001, Campbell v. Iran, 01 Civ. 2104 (D.D.C.) (RCL).  (Pet. 56.1 ¶ 4.)  The District of

Columbia Court consolidated the two cases.  (Pet. 56.1 ¶ 5.)

   On December 22, 2006, the District of Columbia Court entered default

judgment against Iran, the MOIS and the IRGC.  See Estate of Heiser v. Islamic Republic of

Iran, 466 F. Supp. 2d 229 (D.D.C. 2006).  It concluded that the three defendants were jointly

and severally liable for damages totaling $254,431,903.  (Pet. 56.1 ¶ 6.)

   On January 13, 2009, the District of Columbia Court retroactively applied the

recently enacted section 1605A of the FSIA, 28 U.S.C. § 1605A,[1] and that the petitioners

were entitled to proceed under the new statute.  (Pet. 56.1 ¶ 7; Seniawski Dec. Ex. 2.)

Thereafter, on September 30, 2009, that court entered a supplemental judgment under section

1605A of the FSIA, awarding additional damages for lost wages and future earnings totaling

$336,658,063.  (Pet. 56.1 ¶ 8; Seniawski Dec. Ex. 3.)

   B.  Orders Directed to Satisfying the Judgment.

   The District of Columbia Court subsequently issued orders directed to the

collection of the two judgments.  On February 7, 2008, it concluded that, pursuant to 28

U.S.C. § 1610(c), a period had elapsed following entry of judgment sufficient to authorize an

---

[1] Section 1605A, like its predecessor 28 U.S.C. § 1605(a)(7), exempted from foreign immunity any state that
engaged in terrorism-related activities or provided material support to such activities.

attachment in aid and execution of the December 2006 judgment.  (Pet. 56.1 ¶ 9; Seniawski

Dec. Ex. 4.)  On May 10, 2010, it reached the same conclusion as to the September 2009

supplemental judgment.  (Pet. 56.1 ¶ 10; Seniawski Dec. Ex. 5.)

On September 8, 2008, the petitioners registered the December 2006 judgment

in this District, pursuant to 28 U.S.C. § 1963.  (Pet. 56.1 ¶ 13; M18-302, judgment no.

08,1562; Seniawski Dec. Ex. 7.)  Petitioners registered the September 2009 judgment in this

District on December 6, 2010.  (Amended Petition ("Pet.") 56.1 ¶ 14; 10 MC 00005,

judgment no. 10,2146; Seniawski Dec. Ex. 8.)  Thereafter, pursuant to Rule 69, Fed. R. Civ.

P., and New York CPLR § 5230, the petitioners served writs of execution issued by the Clerk

of this District on the U.S. Marshal.  (Pet. 56.1 ¶ 15; Seniawski Dec. Ex. 9 & 10.)  The U.S.

Marshal then served the writs on the Bank of Tokyo.  (Pet. 56.1 ¶ 16; Seniawski Dec. Ex. 10.)

C.  Procedural History of the Present Action.

Petitioners commenced this action by filing a petition for a turnover order

pursuant to Rule 69 and sections 5225 and 5227 of the CPLR.  (Docket # 1.)  Petitioners

assert that the respondent Bank of Tokyo possesses assets belonging instrumentalities of the

MOIS, the IRGC and the government of Iran.  (Pet. ¶¶ 25-26.)  The Petition states that the

respondent is named as a defendant pursuant to CPLR § 5225(b), which permits a judgment

creditor to commence a special proceeding against a person in possession or custody of

money owed to a judgment creditor.  (Pet. ¶ 6.)  The respondent asserts no right to these

assets.  (Pet. 56.1 ¶ 27.)

Petitioners seek to recover funds that were blocked pursuant to Presidential

Executive Orders and directives issued by the Office of Foreign Assets Control ("OFAC"), an

agency of the United States Department of Treasury. These funds are held by entities that

OFAC has designated as Specially Designated Nationals ("SDNs"), and deemed "individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries."[2] Petitioners contend these funds are owned by mere instrumentalities of the Islamic Republic of Iran.  They seek an order directing that the following blocked assets be turned over to them, in aid of the judgments entered by the District of Columbia Court: $90,268.80 from Bank Sepah, International, PLC ("BSI"); $4,740 from Azores Shipping Company LL FZE ("Azores"); $61,974 and $99,974 from IRISL Benelux NV; $97,767.50 from the Export Development Bank of Iran; and $2,181.88 from Bank Melli Iran ("Bank Melli") (collectively, the "Iran Entities").  (Seniawski Dec. ¶ 20.)  These entities all have been served with notice of petitioners' claims, but have filed no responses and have not appeared in this action.  (Seniawski Dec. ¶¶ 21-23.)  Each of these entities is listed by OFAC as a "proliferator" of "weapons of mass destruction" or as a global terrorist.  (Seniawski Dec. ¶ 24.)

It is undisputed that respondent Bank of Tokyo maintains bank accounts holding the blocked assets of the SDNs listed above.  (Pet. 56.1 ¶ 25.)  In its memorandum of law, Bank of Tokyo states that it has frozen these assets pursuant to OFAC directive.  (Response Mem. at 2.)  Under 31 C.F.R. § 595.203, Bank of Tokyo was required to maintain the funds in interest-bearing accounts.

On August 23, 2011, Magistrate Judge Dollinger, to whom this action was referred for general pretrial supervision, signed an order directing service of the Petition and other relevant documents to all third parties, with the documents translated into Farsi.  (Docket # 25.)  The respondent produced contact information for the Iran Entities.  (Pet 56.1 ¶ 22.)  Specifically, the service order stated: "Any Third Party who fails to assert a claim to the

---

[2] See http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx.

Blocked Assets or take any action within sixty (60) days of the date indicated on the Notice of

Lawsuit shall be deemed to forever waive any claims that such Third Party may have against

the Blocked Assets, or against Respondent or Petitioners with respect to the Blocked Assets."

(Docket # 25 ¶ 9.)  The deadline for any third party to appear in this matter or to assert a claim

has since expired.  (Pet. 56.1 ¶ 24.)

In its response to the present motion, Bank of Tokyo states that it "does not

oppose the ultimate relief sought by Petitioners in the Motion, namely, the turnover of the

Blocked Assets."  (Response Mem. at 1.)  The United States also has submitted letter-briefs

setting forth its views on the petitioners' summary judgment motion.  The United States has

neither supported nor opposed the motion.

SUMMARY JUDGMENT STANDARD.

Summary judgment "shall" be granted "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Rule 56(a), Fed. R. Civ. P.  It is the burden of a movant on a summary judgment

motion to come forward with evidence on each material element of his claim or defense,

sufficient to demonstrate that he or she is entitled to relief as a matter of law.  Vt. Teddy Bear

Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).  In raising a triable issue of

fact, the non-movant carries only "a limited burden of production," but nevertheless "must

'demonstrate more than some metaphysical doubt as to the material facts,' and come forward

with 'specific facts showing that there is a genuine issue for trial.'"  Powell v. Nat'l Bd. of

Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d

1067, 1072 (2d Cir. 1993)).

A fact is material if it "might affect the outcome of the suit under the governing law," meaning that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party. Costello, 632 F.3d at 45; accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-88 (1986). In reviewing a motion for summary judgment, the court may scrutinize the record, and grant or deny summary judgment as the record warrants. Rule 56(c)(3). In the absence of any disputed material fact, summary judgment is appropriate. Rule 56(a).

Though the respondent does not oppose the motion, petitioners still must establish that they are entitled to judgment as a matter of law. "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then 'summary judgment must be denied even if no opposing evidentiary matter is presented.'" Vt. Teddy Bear Co., 373 F.3d at 244 (emphasis in original) (quoting Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 2001)); see also Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996) (summary judgment "may properly be granted only if the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law.") (quotation marks and citation omitted).

## DISCUSSION

The Court first reviews FSIA provisions that permit a successful plaintiff to attach funds that have been blocked pursuant to executive order and OFAC directives. Second, the Court examines presidential authority to block certain international financial

transactions and OFAC's implementation of its blocking regime.  Finally, the Court examines

the evidence submitted by petitioners that the entities from which petitioners seek recovery

are instrumentalities of the Republic of Iran.

> I.      The FSIA Framework for Sovereign Liability and the Execution of
>         Judgment.

The FSIA "provides the exclusive basis for subject matter jurisdiction over all

civil actions against foreign state defendants, and therefore for a court to exercise subject

matter jurisdiction over a defendant the action must fall within one of the FSIA's exceptions

to foreign sovereign immunity."  Weinstein v. Islamic Republic of Iran, 609 F.3d 43, 47 (2d

Cir. 2010).  Section 1605(a)(7), which has since been repealed with many of its terms

incorporated into 28 U.S.C. § 1605A,[3] "abrogates immunity for those foreign states officially

designated as state sponsors of terrorism by the Department of State where the foreign state

commits a terrorist act or provides material support for the commission of a terrorist act and

the act results in the death or personal injury of a United States citizen."  Weinstein, 609 F.3d

at 48; see also Levin v. Bank of New York, 2011 WL 812032, at *8-9 (S.D.N.Y. Mar. 4,

2011) (discussing relationship between sections 1605(a)(7) and 1605A).  Iran has been

designated as a state sponsor of terrorism since 1984, and is subject to jurisdiction under

section 1605A and its predecessor statute, section 1605(a)(7).  See Weinstein, 609 F.3d at 48.

The FSIA defines a "foreign state" to include "a political subdivision of a

foreign state or an agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a).  It

defines an "instrumentality" to include "a separate legal person, corporate or otherwise" that

either is "an organ of a foreign state" or a person "whose shares or other ownership interest is

owned by a foreign state or political subdivision thereof," provided that it is not a citizen of

---

[3] See Pub. L. 110-181, Div. A, § 1083(b)(1)(A)(iii), Jan. 28, 2008, 122 Stat. 341.

the United States or "created under the laws of any third country." 28 U.S.C. § 1603(b)(1-3). The District of Columbia Court concluded that the defendants in that action were subject to jurisdiction under the then-operative section 1605(a)(7), which provided a terrorism exemption from a foreign government's immunity against money damages claims in the United States. 466 F. Supp. 2d at 254-55. It also concluded that those defendants were liable to the plaintiffs. Id. at 271-356.

The Terrorism Risk Insurance Act of 2002 ("TRIA") provides for attachment in aid of execution of a judgment. Section 201(a) of TRIA, which is codified as a note to 28 U.S.C. § 1610, states:

> Notwithstanding any other provision of law, and except as provided in subsection (b) [of this note], in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A or 1605(a)(7) (as such section was in effect on January 27, 2008) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

Pub. L. 107-297, Title II, § 201(a), (b), (d), Nov. 26, 2002, 116 Stat. 2337, as amended, Pub. L. 112-158, Title V, § 502(e)(2), Aug. 10, 2012, 126 Stat. 1260. According to the Second Circuit, it is "beyond cavil that Section 201(a) of the TRIA provides courts with subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an instrumentality of the judgment-debtor, even if the instrumentality is not itself named in the judgment." Weinstein, 609 F.3d at 50.

Separately, section 1610(g) permits attachment in aid of an execution of a judgment entered under section 1605A. It provides that "the property of a foreign state

against which a judgment is entered under section 1605A, and the property of an agency or

instrumentality of such a state, including property that is a separate juridical entity or is an

interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid

of execution, and execution, upon that judgment as provided in this section, regardless of the

level of economic control over the property by the government of the foreign state." 28

U.S.C. § 1610(g)(1)(A).  The District of Columbia Court observed that the statute "'expand[s]

the category of foreign sovereign property that can be attached; judgment creditors can now

reach any U.S. property in which Iran has any interest . . . whereas before they could only

reach property belonging to Iran.'" Estate of Heiser v. Islamic Republic of Iran, 807 F. Supp.

2d 9, 18 (D.D.C. 2011) (quoting Peterson v. Islamic Republic of Iran, 627 F.3d 1117, 1123

n.2 (9th Cir. 2010)).  "Thus, the only requirement for attachment or execution of property is

evidence that the property in question is held by a foreign entity that is in fact an agency or

instrumentality of the foreign state against which the Court has entered judgment."  Id. at 19.

> II.     Executive Branch Authority over Foreign Transactions and the
>         Blocking Procedures of the Office of Foreign Asset Control ("OFAC").

The International Emergency Economic Powers Act, 50 U.S.C. § 1701, et seq.

("IEEPA"), authorizes the President to regulate international economic transactions.

Specifically, it permits the executive branch to "investigate, regulate or prohibit . . . transfers

of credit or payments  . . . by . . . any banking institution, to the extent that such transfers . . .

involve any interest of any foreign country . . . [and any] transactions involving . . . any

property in which any foreign country . . . has any interest."  50 U.S.C. § 1702(a)(1).

Presidents have issued several executive orders under the IEEPA, including Executive Order

No. 12947, 60 Fed. Reg. 5079 (Jan. 23, 1995) (Prohibiting Transactions with Terrorists Who

Threaten to Disrupt the Middle East Peace Process), Executive Order No. 13224, 66 Fed. Reg.

49079 (Sept. 23, 2001) (Blocking Property and Prohibiting Transactions With Persons Who

Commit, Threaten to Commit, or Support Terrorism), and Executive Order No. 13382, 70

Fed. Reg. 38567 (June 28, 2005) (Blocking Property of Weapons of Mass Destruction

Proliferators and Their Supporters), and Executive Order No. 13599, 77 Fed. Reg. 6659 (Feb.

5, 2012) (Blocking Property of the Government of Iran and Iranian Financial Institutions).

OFAC describes itself as "act[ing] under Presidential national emergency

powers, as well as authority granted by specific legislation, to impose controls on transactions

and freeze assets under US jurisdiction."[4]  OFAC has implemented numerous so-called

"blocking" regimes, including the Weapons of Mass Destruction Proliferators Sanction, 31

C.F.R. § 544.101, et seq., and the Terrorism Sanctions Regulation, 31 C.F.R. § 595.101, et

seq. OFAC requires the blocking of "all property and interests in property that are in the

United States" belonging to SDNs.  31 C.F.R. § 544.201(a).  OFAC defines "interest" as "an

interest of any nature whatsoever, direct or indirect," 31 C.F.R. §§ 544.305, and property as

any "property, real, personal, or mixed, tangible or intangible, or interest or interests therein,

present, future or contingent," id. § 544.308.  OFAC publishes a list of SDNs at

http://www.treasury.gov/sdn, which it frequently updates.

OFAC has designated the following entities as SDNs: Bank Sepah, Bank

Sepah International, PLC ("BSI"); Iranohind Shipping Company ("Iranohind"); Azores

Shipping Company LL FZE ("Azores"); IRISL Benelux NV; Export Development Bank of

Iran ("EDBI"); Bank Melli; and the Islamic Republic of Iran Shipping Lines ("IRISL").

(Office of Foreign Assets Control, Specially Designated Nationals and Blocked Persons List,

---

[4] http://www.treasury.gov/about/organizational-structure/offices/Pages/Office-of-Foreign-Assets-Control.aspx

January 24, 2013, at 97, 99, 100, 161, 221, 233.)[5]  The petitioners seek to attach funds

belonging to these entities.  (Seniawski Dec. Ex. 14.)  Respondent Bank of Tokyo has

expressly stated that it blocked these entities' assets pursuant to OFAC directive.  (Response

Mem. at 2.)  As previously noted, the TRIA provides that "the blocked assets" of a "terrorist

party" "shall be subject to execution or attachment in aid of execution in order to satisfy such

judgment to the extent of any compensatory damages for which such terrorist party has been

adjudged liable."  Note, 28 U.S.C. § 1610.

III.    The Petitioners Have Come Forward with Evidence that the Eight Non-
        Party Iranian Entities Are Instrumentalities of Iran.

       In support of its summary judgment motion, the petitioners have submitted the

affidavit of Patrick L. Clawson, Ph.D, the Director of Research of the Washington Institute

for Near East Policy.  Clawson states that he has specialized knowledge concerning financial

accounts, wire transfers and other transactions involving assets blocked by OFAC directives.

(Clawson Aff't ¶ 10.)  Clawson also asserts that he is knowledgeable as to bank charters and

ownership, particularly as to Iran's national and state-owned banks.  (Clawson Aff't ¶ 10.)

He swears that he closely follows Iran's press and political system and has researched its

economy and commercial enterprises.  (Clawson Aff't ¶¶ 9-12.)

       Clawson asserts that the following entities are owned at least in part by the

government of the Islamic Republic of Iran:

A.  Bank Melli.

       According to Clawson, the Central Bank of Iran expressly recognizes Bank

Melli Iran as a "commercial government-owned bank."  (Clawson Aff't ¶ 13.)  Bank Melli

---

[5] Available at http://www.treasury.gov/ofac/downloads/t11sdn.pdf.

states in a financial report available on its website that "[t]he capital is completely owned by the Government of the Islamic Republic of Iran." (Clawson Aff't ¶ 13.)[6]

Based on the express statements of Bank Melli, the petitioners have established that Bank Melli is an "instrumentality" of the government of Iran. 28 U.S.C. § 1603(b).

B. Bank Sepah.

Iran nationalized ownership of Bank Sepah in 1980. (Clawson Aff't ¶ 14.) On its website, the Central Bank of Iran describes Bank Sepah as a "commercial government-owned bank."[7] (Clawson Aff't ¶ 14.) Clawson states that he is aware of no evidence of any planned changes in ownership or plans to privatize Bank Sepah. (Clawson Aff't ¶ 14.)

Because the Central Bank of Iran identifies Bank Sepah as a "commercial government-owned bank," petitioners have established that Bank Sepah is an "instrumentality" of the government of Iran. 28 U.S.C. § 1603(b).

C. BSI.

On January 9, 2007, the Treasury Department concluded that BSI is owned and controlled by Bank Sepah. (Clawson Aff't ¶ 15.) BSI's company website states that it "is a wholly-owned subsidiary of Bank Sepah Iran."[8] (Clawson Aff't ¶ 15.) Its website also states that it was incorporate to "[take] over the assets, liabilities and business of the London Branch of Bank Sepah, Iran."[9] (Clawson Aff't ¶ 15.)

As noted, the Central Bank of Iran describes Bank Sepah as a "commercial government-owned bank." As a wholly-owned subsidiary of Bank Sepah operating in

---

[6] See http://www.bmi.ir/Fa/uploadedFiles/FinanceReportFiles/2011_2_13/f97c06b161__2752675b48.pdf .
[7] See http://www.cbi.ir/simplelist/3088.aspx.
[8] See http://www.banksepah.co.uk/downloads/Annual_Report_and_Financial_Statements_31_03_05.pdf.
[9] See http://www.banksepah.co.uk/?page=13.

London, BSI, like its parent company, qualifies as an "instrumentality" of the government of

Iran.  28 U.S.C. § 1603(b).

     D.  <u>EDBI.</u>

     The website of the Central Bank of Iran lists EDBI as a "specialized

government bank."[10]  (Clawson Aff't ¶ 16.)  Clawson asserts that EDBI is "widely known" as

a "state owned, specialist export and import bank created to increase non-oil exports from Iran

and develop international trade."  (Clawson Aff't ¶ 16.)  He states that it "is active in

promoting Iran's non-oil exports and trade with Iran's neighbors."  (Clawson Aff't ¶ 16.)  On

October 22, 2008, OFAC froze EDBI assets under U.S. jurisdiction.  (Clawson Aff't ¶ 16.)

OFAC identifies EDBI as "one of the leading intermediaries handling Bank Sepah's

financing, including WMD-related payments."[11]

     This Court affords little weight to Clawson's statements about what is "widely

known" about EDBI's operations.  These unsupported statements are not accompanied by any

citation to the record or publicly available factual information.  Nevertheless, the fact that the

Central Bank of Iran lists EDBI as a "specialized government bank" and that OFAC has

deemed EDBI an intermediary in Bank Sepah financing operations is sufficient evidence that

EDBI functions as an instrumentality of the government of Iran.  28 U.S.C. § 1603(b).

     E.  <u>IRISL.</u>

     OFAC recognizes IRISL as under control by the government of Iran, and

acting as the country's "national maritime carrier . . . ."[12]  (Clawson Aff't ¶ 17.)  It has

concluded that IRISL had placed its international network of ships and hubs into the service

of the Iranian military, particularly the arm of its military overseeing ballistic missile

---

[10] http://www.cbi.ir/simplelist/2389.aspx.
[11] http://www.treasury.gov/press-center/press-releases/Pages/hp1231.aspx.
[12] http://www.treasury.gov/connect/blog/pages/No-Safe-Port-for-IRISL.aspx.

development.  We imposed sanctions on IRISL, its corporate network, and its fleet,

prohibiting U.S. persons from dealing with the company."[13]  OFAC also has concluded that

IRISL has created front companies in Panama to conceal the ownership of its vessels, and has

repeatedly repainted, renamed and transferred nominal ownership of vessels.  (Id.)

As Iran's "national maritime carrier," IRISL functions as an instrumentality of

the government of Iran.  28 U.S.C. § 1603(b).

### F.   Azores, Iranohind and IRISL Benelux NV.

Petitioners assert that Azores, Iranohind and IRISL Benelux NV are all entities

controlled by IRISL, citing to conclusions reached by the United States Treasury, as well as

British and European Union Authorities.

The United States Treasury has frozen the assets of Azores and announced

restrictions on transactions related to the company.[14]  It identifies Azores as a front company

for IRISL, based in the United Arab Emirates.  Id.  The European Union also has identified

Azores as a "[f]ront company owned or controlled by IRISL or an IRISL affiliate.  It is the

registered owner of a vessel owned or controlled by IRISL."[15]  The European Union

concluded that Azores is controlled by Moghddami Fard, who is the company's director, and

that Fard acts as IRISL's regional director in the United Arab Emirates.  Id.  The EU has

stated that Fard has organized several companies in an attempt to circumvent restrictions on

the IRISL.  Id.  The British government also has imposed restrictions on Azores, citing its

relationship with Fard.[16]  Clawson asserts that the prominent role played by Fard and the

evidence of IRISL ownership suggest that the IRISL controls Azores.  (Clawson Aff't ¶ 18.)

---

[13] http://www.treasury.gov/connect/blog/pages/No-Safe-Port-for-IRISL.aspx .
[14] http://www.treasury.gov/press-center/press-releases/Pages/tg1212.aspx.
[15] http://eurlex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2011:319:0011:0031:EN:PDF
[16] http://www.hm-treasury.gov.uk/d/finsanc_public_notice_reg1245_021211.pdf

The United States Treasury has designated Iranohind as engaging in proliferation activities.  It has stated that the company was "found to be owned or controlled by or acting or purporting to act for or on behalf of, director or indirectly, IRISL."[17]  The Clawson Affidavit summarizes similar findings by the United Nations and the British government, as well as reports by an Indian shipping company and press outlets concerning Iranohind's relationship to IRISL.  (Clawson Aff't ¶ 19.)

The United States Treasury has designated IRISL Benelux NV as engaging in proliferation activities, stating that it was "found to be owned or controlled by or acting or purporting to act for or on behalf of, directly or indirectly, IRISL."[18]  It stated that entities doing businesses with this and other IRISL entities "may be unwittingly helping the shipping line facilitate Iran's proliferation activities."  Id.

Based on the foregoing, this Court concludes that Azores, Iranohind and IRISL Benelux NV functioned as instrumentalities of the government of Iran.  28 U.S.C. § 1603(b).  Each is owned or controlled by, or acts on behalf of IRISL, which is Iran's national carrier.

IV.    The Petitioners Are Entitled to Attach the Requested Funds.

Petitioners have come forward with evidence that the Iran Entities are agencies and instrumentalities of Iran.  In addition, OFAC has listed each of these entities as SDNs.  (Office of Foreign Assets Control, Specially Designated Nationals and Blocked Persons List, January 24, 2013, at 97, 99, 100, 161, 221, 233.)[19]  Under the FSIA, because the Iran entities are instrumentalities of Iran, the assets of these entities may be attached in aid of execution of judgment.  28 U.S.C. § 1610(g).  Section 201 of the TRIA also states that these assets may be subject to attachment in aid of execution of judgment.  Note, 28 U.S.C. § 1610.

[17] http://www.treasury.gov/press-center/press-releases/Pages/hp1130.aspx.
[18] http://www.treasury.gov/press-center/press-releases/Pages/hp1130.aspx.
[19] http://www.treasury.gov/ofac/downloads/t11sdn.pdf.

Petitioners have submitted a chart produced by the respondent reflecting the EFT transactions, including the transactions' dates, the sending banks and the transactions' originators and beneficiaries. (Seniawski Dec. Ex. 14.) Specifically, the chart reflects that BSI was the intended beneficiary of a $90,628.80 ETF of June 21, 2007; Azores originated a $4,740 EFT of September 29, 2008; IRISL Benelux NV was the intended beneficiary of two EFTs of January 21 and 22, 2009, the first in an amount of $61,974 and the second in an amount of $99,974; EDBI was intended beneficiary of a $97,767.50 EFT of April 24, 2009; and Bank Melli was issuing bank in a $2,181.88 EFT of July 26, 2010. (Seniawski Dec. Ex. 14.) The respondent participated in these transactions, either as the sending bank or the beneficiary's bank. (Seniawski Dec. Ex. 14.) This chart is evidence that the Iran Entities have an interest in the blocked assets that warrant them to attachment in aid of execution of judgment. In addition, the Iran Entities received notice of this action and have failed to appear and assert a claim as to any of the assets.

Pursuant to Rule 69(a), Fed. R. Civ. P., a money judgment is enforced by a writ of execution. "The procedure on execution – and in proceedings supplementary to and in aid of judgment or execution – must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." Id. New York CPLR § 5225(b) governs the enforcement of a judgment as to property not in the possession of a judgment debtor. It states in part:

> Upon a special proceeding commenced by the judgment creditor, against a person in possession or custody of money or other personal property in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee, the court shall require such person to pay the money, or so much of it

> as is sufficient to satisfy the judgment, to the judgment creditor and, if
> the amount to be so paid is insufficient to satisfy the judgment, to
> deliver any other personal property, or so much of it as is of sufficient
> value to satisfy the judgment, to a designated sheriff. . . . Notice of
> the proceeding shall also be served upon the judgment debtor in the
> same manner as a summons or by registered or certified mail, return
> receipt requested. The court may permit the judgment debtor to
> intervene in the proceeding.

Id. Petitioners have come forward with evidence that respondent Bank of Tokyo is "a person in possession or custody of money" that belongs to the Iran Entities, a fact that Bank of Tokyo does not dispute. The named judgment debtors are the Islamic Republic of Iran, the Iranian Ministry of Information and Security, and the Iranian Islamic Revolution Guard Corps, and petitioners have come forward with evidence that the Iran Entities function as instrumentalities of the Islamic Republic of Iran. Pursuant to section 201(a) of the TRIA, as instrumentalities of the Islamic Republic of Iran, "the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution." Note, 28 U.S.C. § 1610. Under CPLR § 5225(b), "the judgment debtor is entitled to the possession of such property . . . ."

Based on the foregoing, this Court concludes that the petitioners have established their entitlement to an order attaching the Iran Entities' funds that are possessed by the respondents and that they have satisfied the procedure set forth by New York CPLR § 5225(b).

> V.    This Court and the Parties Accept the Representations of the United
>       States that No OFAC License Is Required to Authorize Release of the
>       Blocked Assets.

While the respondent does not oppose the petitioners' motion, it notes concerns that OFAC must issue a license specific to the blocked assets before they can be made available for attachment. (Response Mem. at 2-3.) It states that if it were to turn over

the funds without an OFAC license, it could be subject to civil and criminal penalties. (Response Mem. at 3.)  The IEEPA sets forth civil and criminal penalties for violating the statute and any related license, order, regulation or prohibition.  50 U.S.C. § 1705.  As respondent notes, the Department of Treasury also has stated on its website that "[a] license is an authorization from OFAC to engage in a transaction that otherwise would be prohibited."[20] Respondent argues that the petitioners should bear any risks or expenses associated with releasing the blocked funds.  (Resp. Mem. at 3.)

At the invitation of the Court and in response to the current motion, the United States submitted a Statement of Interest pursuant to 28 U.S.C. § 517.  The Statement concludes that "in the event a court determines that blocked assets are subject to TRIA, those funds may be distributed without a license from OFAC."  (Statement of Interest at 3.)  The Statement attaches a January 6, 2006 letter addressed to Judge Marrero in Weininger v. Castro, 05 Civ. 7214 (VM), which asserted in identical terms that if the TRIA applied to the underlying funds, the funds can be distributed without a license from OFAC.  (Statement of Interest Ex. E.)  See also Weininger v. Castro, 462 F. Supp. 2d 457, 499 (S.D.N.Y. 2006) (quoting same).  Petitioners also state that they have kept OFAC informed of this litigation and submitted a copy of the present motion to OFAC, as required by 31 C.F.R. § 501.605. (Seniawski Supp. Dec. ¶¶ 3-4 & Ex. 2.)

Following the submissions by the government and the petitioners, Bank of Tokyo now "accepts the representations of counsel for the Petitioners about its communications with OFAC and accepts the Government's stated position that a turnover order of this Court would be sufficient" to permit Bank of Tokyo "to disburse the Blocked

---

[20] http://www.treasury.gov/resource-center/faqs/Sanctions/Pages/answer.aspx#60.

Assets without the need for a separate OFAC license." (Response to Statement of Interest ¶ 3.)

This Court is aware of no contrary authority that would require an OFAC license in this instance.  It accepts the Statement of Interest's assertion that no OFAC license is required.

CONCLUSION

The petitioners' motion for summary judgment is GRANTED.  (Docket # 36.) The Clerk is directed to terminate the motion.

Petitioners are directed to submit a proposed order, on notice to the respondent, within 14 days of the date of this Memorandum and Order.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
          January 29, 2013